UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

VS.                                CRIMINAL NO. 3:08CV89TSL-FKB

DWAYNE G. DEER

MEMORANDUM OPINION AND ORDER

On October 16, 2008, defendant Dwayne G. Deer pled guilty to
one count of conspiracy to commit bank fraud in violation of 18
U.S.C. §§ 371 and 1344.  On January 29, 2010, this court, after
finding an actual loss amount of between $2.5 and $7 million,
sentenced Deer to a 37-month term of imprisonment and to three
years of supervised release.  At that time, the court deferred any
finding with respect to restitution.  Based on evidence and
arguments thereafter presented at an evidentiary hearing on the
issue and in the parties' post-hearing memoranda, the court makes
the following findings and conclusions.

While the July 17, 2008 information charging Deer detailed
Deer's criminal activity only as it related to two victims, the
Presentence Investigation Report (PSIR) described a much larger
scheme to defraud, which it summarized as follows:

> Prosecution in this case is the result of an
> investigation conducted by the Office of Inspector
> General (OIG) with the Federal Deposit Insurance
> Corporation (FDIC) and the Federal Bureau of
> Investigation.

The investigation determined that James Todd Phillips owned and operated Statewide Realty Holdings, LLC (Statewide Realty) as a real estate enterprise in Pike County, Mississippi, and elsewhere, from December 31, 2003, through December 2007. Phillips was also president and director of a domestic corporation known as Todd Phillips Investments, Inc. (TPI), which operated as a real estate enterprise in Pike County, Mississippi, and elsewhere, from July 1998 through December 2007. Statewide Realty and TIP owned real properties throughout the State of Mississippi for investment or development purposes. Dewayne Deer was an attorney licensed to practice law in Mississippi, and was employed by Phillips in various legal capacities during the course of his business dealings. Dawn Stinson was secretary and assistant employed by Phillips throughout the time period named in the charging instruments. The investigation further revealed that beginning around March 2003, Phillips conspired with Deer, Stinson, and others to commit bank fraud, in that he repeatedly pledged the same parcels of encumbered real property as collateral for commercial loans in the names of Statewide Realty and TPI, while fraudulently representing to the lenders, financial institutions, and to title insurance companies associated with the loan transactions that TPI held unencumbered title to the real property, and the lender consequently would receive a priority security interest in the property as collateral for the respective loans. These misrepresentations were material to the funding decisions of the financial institutions and to the issuance of related title commitments and policies by title insurance companies. In support of these misrepresentations, Phillips and others provided fraudulent title opinions and other documentation, including but not limited to fabricated cancellations of deeds of trust. He also caused these fraudulent deeds of trust to be filed (or filed by him) with the Chancery Courts in various counties by court employees.

At the restitution hearing, the government presented the testimony of Special Agent Marten L. Williams of the FDIC's Office of Inspector General, who claimed $7,099,643.01 as the

"approximate" amount of actual loss incurred by the victims of the fraudulent scheme.  The government also presented the testimony of attorney Derek Henderson, who served as bankruptcy trustee for TPI.  Henderson testified that the TPI bankruptcy estate had paid $595,682.60 to four of the victims of Phillips' and Deer's fraud, which were also creditors in TPI's bankruptcy.  In its post-hearing submission, the government asserts that twelve of the scheme's victims are owed a total of $6,035,685.29.  For his part, Deer maintains that two victims are owed $628,660.[1]

The parties do not dispute that restitution by Deer is mandatory under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. §§ 3663A-3664 (MVRA), which directs that when a defendant is convicted of one or more of certain offenses, including bank fraud, the court "shall order restitution to each victim in the full amount of each victim's losses as determined by court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1).  See also United States v. Reese, 998 F.2d 1275, 1282 (5th Cir. 1993) (stating that MVRA defines exclusive measure of restitution).  The Act defines a victim as:

> a person directly and proximately harmed as a
> result of the commission of an offense for

---

[1]     The court notes that at the hearing, both government witnesses were extensively cross-examined by Deer, who presented no witnesses of his own.

> which restitution may be ordered including, *in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern*.

18 U.S.C. § 3663A(a)(2)(emphasis added).  The restitution order must be limited to the victim's actual losses "caused by the specific conduct underlying the offense of conviction."  United States v. Arledge, 553 F.3d 881, 899 (5th Cir. 2008), cert. denied, --- U.S. ----, 129 S. Ct. 2028, 173 L. Ed. 2d 1088 (2009). Significantly, "[w]here a fraudulent scheme is an element of the conviction," as is the case with bank fraud, see 18 U.S.C. § 1344, "the court may award restitution for actions pursuant to that scheme," see United States v. Inman, 411 F.3d 591, 595 (5th Cir. 2005) (internal citations and quotations omitted).  See also United States v. Maturin, 488 F.3d 657, 661 (5th Cir. 2007) (since MVRA "broadens the definition of the term 'victim' for any 'offense that involves as an element a scheme, conspiracy, or pattern of criminal activity' to include 'any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern,' . . . this court has held 'that where a fraudulent scheme is an element of the conviction, the court may award restitution for actions pursuant to that scheme'") (citation omitted).  However, "the restitution for the underlying

4

scheme to defraud is limited to the *specific* temporal scope of the indictment." <u>Inman</u>, 488 F.3d at 595.

In cases involving the loss of property, such as loan proceeds, the MVRA requires that the defendant either return the property or, if that is "impossible, impracticable, or inadequate," to pay "the greater of ... the value of the property on the date of the damage, loss, or destruction; or ... the value of the property on the date of sentencing, less ... the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). <u>See also</u> <u>Reese</u>, 998 F.2d at 1283 (examining Victim and Witness Protection Act of 1982, 18 U.S.C. § 3663 (VWPA), and concluding that property as to which victim may have suffered "'damage to or loss or destruction' could only be loan proceeds funded in cash at closing").[2] In addition, the MVRA includes in the amount of restitution "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense." 18 U.S.C. § 3663A(b)(4). The court, however, may not

_____

[2]    The MVRA makes restitution mandatory for the crimes it covers, and the VWPA provides for discretionary restitution for the crimes it covers. <u>See</u> 18 U.S.C. § 3663(a)(1)(A)(excluding from the VWPA "offense[s] described in section 3663A(c)"). Although the two Acts do not overlap, they are similar and for the most part, cases decided under one act generally serve as precedents for the other. 3 <u>Fed. Prac. & Proc. Crim.</u> § 546 (4th ed. Supp. 2011).

award a victim consequential damages.   <u>United States v. Onyiego</u>, 286 F.3d 249, 256 (5th Cir. 2002).

The burden of proof is on the government to demonstrate by a preponderance of the evidence the amount of loss sustained by a victim.   18 U.S.C. § 3664(a),(e).   In determining the appropriate amount of restitution, the court "may consider affidavits and letters by the injured party[,] . . . and may consider other hearsay evidence that bears minimal indicia of reliability so long as the defendant is given an opportunity to refute that evidence." <u>Reese</u>, 998 F.2d at 1282 (determining appropriate amount of restitution under VWPA, under which restitution may be ordered at the judge's discretion).

In determining the amount of restitution to be paid, the court may not consider the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source.   18 U.S.C. § 3664(f)(1)(B). However, in structuring the restitution order,

> [i]f a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

18 U.S. § 3664(j)(1).

Where a defendant has entered into a civil settlement with a victim under which the victim has agreed to release the defendant

6

from all civil liability, the court retains the discretion to impose restitution in spite of the civil settlement.  United States v. Sheinbaum, 136 F.3d 443, 447 (5th Cir. 1998).  The effect of a civil settlement on criminal restitution "depends upon the payment made in the settlement, whether the claims settled involved the same acts of the defendant as those underlying his criminal conviction, and whether the payment satisfies the penal purposes the court sought to impose."  Id. ("courts possess the discretion to impose restitution orders in spite of civil settlements"); United States v. Calbat, 266 F.3d 358, 365 (5th Cir. 2001)(same).  In the event the court determines that a restitution award is appropriate despite a civil settlement, the court must "reduce the size of its restitution order by any amount received by the victim as part of the civil settlement" to avoid double-counting.  Id.; see also § 3664(j)(2) (stating that any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in state or federal civil proceeding).  It is the defendant's burden to establish an offset.  Sheinbaum, 136 F.3d at 449.

Before considering losses with respect to each alleged victim of Phillips' and Deer's scheme, the court notes that the government takes the position that the majority of the victims to whom restitution is owed are entitled to recover interest and/or

7

attorney fees.  With respect to interest, the government argues
that the inclusion of the victims' bargained-for interest is
proper to ensure that they are made whole.  See United States v.
Rochester, 898 F.2d 971, 974 (5th Cir. 1990) (pre- and post-
judgment interest may be included in restitution award under
VWPA).  In response, Deer does not seem to deny that, as a general
proposition, restitution under the MVRA may properly include
interest.  He maintains, however, that such an award would not be
appropriate to any of his alleged victims because, in his view,
the government has failed to prove either the time period of the
interest or "exactly what the interest is based upon."  He further
objects that in any event, interest may not be awarded at a
"penalty rate," rather than a negotiated interest rate since
"[s]uch a penalty exceeds the goals of the restitution statutes
and provides the victims a profit, rather than simply making them
whole."

     In the court's opinion, the government has developed a
sufficient evidentiary basis to include interest amounts in the
restitution order in those instances where the court finds that an
award of restitution is proper.  Agent Williams testified that in
calculating the amount of restitution due the banks, he and
Special Agent Susan McDavitt considered both information received
from communications with, and documents received from the banks,
and further explained that the amounts sought by the government as

8

interest constituted bargained-for (yet unpaid) interest on the loans that Phillips had fraudulently obtained with Deer's help. Based on Williams' testimony, the court finds, from a preponderance of the evidence, that the interest sought as restitution to the lender victims is bargained-for yet unpaid interest, at rates set forth in the parties' contracts, which is properly recoverable as restitution.[3]

The government maintains that reimbursement of attorney fees is explicitly authorized by § 3664A(b)(4), which states that a defendant must reimburse victims for "for lost income ... and other expenses incurred during participation in the investigation or prosecution of the offense." Under the statute, attorney fees and other litigation expenses may properly be included in a restitution award where "incurred during participation in the investigation and prosecution of the offense." See United States v. Dwyer, 275 Fed. Appx. 269, 270 (5th Cir. 2008) (affirming award of legal fees incurred in victim's investigation of employee's embezzlement, where information gathered was turned over to FBI and U.S. Attorney, thereby "enabling the government to prosecute Dwyer without conducting a significant investigation"); United

---

[3]    Obviously, it would have been helpful for the government to have presented the court with the documents which Agent Williams testified manifested the bargained-for interest rates, and detailed proof as to the victims' interest calculations. However, and notwithstanding this omission, the court found Williams' testimony on this point adequate and credible.

States v. Beaird, 145 Fed. Appx. 853, 855 (5th Cir. 2005) (inclusion in restitution order of "attorneys' fees and litigation expenses, associated with assistance to the FBI in the investigation of Beaird's offense").  In the court's opinion, however, this case does not involve attorney fees incurred as a result of the victims' participation in the investigation or prosecution of the offense.  The government has offered no proof purporting to link the attorneys' fees at issue to the investigation and/or prosecution of this case.  Instead, Agent Williams described the attorney fees in the government's restitution computations as "fees that [the victims] incurred to try to clean up their security and try to get their security sold and basically the fees that they incurred to try to work out who was in priority position."  So understood, these attorneys' fees constitute consequential damages and are not allowed under the statute.  Cf. Onyiego, 286 F.3d at 256 (reversing restitution award which included legal fees incurred when the victim travel agency was forced to defend legal actions brought by various airlines on account of blank airline tickets which were stolen from the victim's office); United States v. Schinnell, 80 F.3d 1064, 1070-71 (5th Cir. 1996) (stating, "We must agree with Schinnell that the district court erred in including ... expenses incurred by [the victim] for ... "'accounting fees and cost to reconstruct the bank statements for the time period that the

10

defendant perpetuated this scheme, temporary employees hired by the company to reconstruct the monthly bank statements, and costs incurred by the company [in borrowing funds] to replace the stolen funds'"); <u>United States v. Mitchell</u>, 876 F.2d 1178, 1184 (5th Cir. 1989) (stating that "[t]here is no provision (in the Restitution Act) authorizing restitution for lost income, cost of restoring property to its pre-theft condition, or cost of employing counsel to recover from an insurance company."). Accordingly, the restitution order will not include amounts for attorneys' fees.

Likewise, the category of expenses denominated by the government as "Other fees" are consequential damages, which are not allowable under § 3663A(b)(4). Agent Williams described these expenses as including "the back taxes, the insurance and the appraisal," not as amounts incurred during participation in the investigation or prosecution of the offense.

Turning to the specific losses alleged by the government to have been suffered by the individual alleged victims of Phillips' and Deer's scheme, the court makes the following findings:

<u>Concordia Bank & Trust</u>:

The PSIR recites, and Deer does not dispute, that Phillips applied for a $800,000 loan from Concordia to supply TPI with lines of credit, and that at the time Concordia made these loans, it was unaware that the collateral offered to secure the notes,

certain real property in Natchez, Mississippi,[4] had been
previously pledged as collateral to secure loans from two other
lenders.  The government asserts that Concordia's actual loss is
$1,064,121,43, which includes the principal balance of $800,000 on
these loans, Loan Numbers 5703409 and 5704855, together
$169,349.11 in interest, $65,515.83 in attorney fees and
$29,256.49 in "other fees."

Deer takes the position that since Concordia now owns at
least some of the collateral which secured the loans, it follows
that Concordia's loss does not include the full $800,000 principal
loan amount, and that this amount must be reduced by the value of
the property which has been returned to Concordia.  He also
contends that the $800,000 figure should be reduced by some yet-
to-be-determined amount pursuant to an agreement between TPI's
bankruptcy estate and Concordia.  The former argument relates to
the government's burden to prove Concordia's actual loss, while
the latter involves Deer's burden to prove he is entitled to an
offset of the restitution amount.

Pursuant to § 3663A(a)(3)(b), in calculating the amount of
loss of loan proceeds for purposes of restitution, there must be a
reduction for "the value of any part of the property that is
returned."  In examining a restitution order in a VWPA case where

---

[4]     According to Williams' testimony and the PSIR, two
buildings, the WIC and USDA Buildings, were situated on this
property, referred to as the Northgate Property in the PSIR.

the victim suffered "damage to or loss of or destruction of" loan proceeds, the Fifth Circuit in <u>Reese</u> held that the district court erred by failing to take into consideration the appraised value of collateral which was returned to the victim in a settlement in lieu of foreclosure.  <u>Reese</u>, 998 F.2d 1284.  The Fifth Circuit observed that, "[c]onceptually, it would seem to us that when a lender accepts conveyance of the secured property in lieu of foreclosure, the value of such property should constitute a partial return of the 'cash loan proceeds.'" <u>Id.</u>; <u>see</u> <u>also</u> <u>United States v. Holley</u>, 23 F.3d 902, 915 (1994) (reversing district court where restitution order did not credit the value of collateral securing loan which was returned to victim via foreclosure and stating that "when the real property that secures such a loan is deeded back to the financial institution, "'the value of such property should constitute a partial return of the "cash loan proceeds"'")(quoting <u>Reese</u>, 998 F.2d at 1284); <u>United States v. Campbell</u>, 106 F.3d 64, 69 (5th Cir. 1997)(holding that bank which loaned defendant $90,000 was not entitled to restitution where bank had previously received $123,917.82 from sale of collateral which had been returned by defendant).[5]

---

[5]     Deer has additionally argued that the amount of Concordia's loss should be offset by the rent that Concordia has received from the buildings' tenants since the property was returned.  This position has no merit.  <u>See</u> <u>Reese</u>, 998 F.2d at 1283 ("We see nothing in the statutory provision which would give a defendant credit for the gain on resale realized after the return of the property.").

There is apparently no dispute that the original loan amount was $800,000 and that some portion of the collateral for the loan has been recovered by Concordia.  However, no evidence has been presented as to the cost, if any, to Concordia to recover the property, or as to the value of that collateral.  At the hearing, Agent Williams testified that at some point, Concordia paid off BancorpSouth's first deed of trust on the property that was the collateral for the loan; but he did not know what Concordia paid to gain first priority or the value of the property which was returned.  Henderson likewise did not know the value of the property.

The court would be warranted in denying any restitution for Concordia in light of the government's failure of proof.  However, Deer himself appears to acknowledge that Concordia has likely suffered a loss, and he urges only that the computation of the amount of restitution he will owe must account for the value of the returned collateral.  Accordingly, rather than deny outright any restitution for Concordia, the court, prior to finalizing its restitution order, will give the government the opportunity to supply the missing information.

With reference to Deer's argument for an offset of the actual loss amount, even had the court concluded that Phillips had demonstrated that he was entitled to an offset on account of TPI's alleged settlement agreement with Concordia, the court is not

14

convinced that the penal purpose of the restitution statute is
satisfied by allowing Deer the benefit of this bargain.
Accordingly, no offset is available to Deer under these
circumstances.

As to Concordia's loss, the court directs that the government
shall have thirty days to present proof upon which the court may
determine the loss amount.

The First Bank:

According to the government, Phillips received five loans
from The First Bank, collateralized by three different properties.
Loan Numbers 9034692 and 9042466 were collateralized by property
in Columbia, Mississippi, in Marion County.  Loan Number 9034978
was secured by the Social Security Building in McComb,
Mississippi, in Pike County, while Loan Numbers 9035885 and
9045422 were secured by the USDA Building in Purvis, Mississippi,
in Lamar County.[6]  The government submits that as a result of
Deer's fraud, First Bank is owed $404,245.09, consisting of
$485,501.15 in principal, $199,660.94 in interest, $68,946.24 in

---

[6]     According to the PSIR, First Bank loaned Phillips
$800,000 secured by the Social Security Building.  Five months
after the loan was made, Phillips created a fraudulent
cancellation of First Bank's first deed of trust, which provided
to Wachovia's closing agent, Closing and Title Services, to induce
Wachovia to loan him $856,000 in exchange for a first deed of
trust on the Social Security Building.
   The PSIR does not purport to detail the transactions related
to the Lamar and Marion County properties.

attorney fees and $35,136.72 in other fees, less $385,000 received from TPI's bankruptcy estate.

The court first concludes that First Bank is not entitled to restitution for any loss relating to the loans secured by the Marion and Lamar County properties.  In the court's opinion, based on its review of the complaint and the transcript from Deer's plea hearing, any loss sought with regard to these properties does not spring from the fraud scheme to which Deer pled guilty, a scheme to defraud banks by double-pledging real property, which involved fraudulent representations to lenders and title companies that Phillips held unencumbered title to property.  United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004) ("When a defendant is convicted of fraud pursuant to a *plea agreement*, ... this Court looks beyond the charging document, and defines the underlying scheme by referring to the mutual understanding of the parties."). Agent Williams testified that the fraud in connection with the loans for the Lamar and Marion County properties related to Phillips' having provided an inflated square footage as to each of these buildings, leading First Bank to make loans that it would otherwise not have made or to loan Phillips more money than it would have otherwise.  Although Williams did not purport to tie any specific portion of the claimed restitution amount to these properties, relying instead on the bottom-line figure provided by First Bank, he did maintain that there was a loss related to these

16

properties on account of Phillips' having provided First Bank with
an inflated square footage.  However, the PSIR does not in any way
describe this behavior as part of Phillips' and Deer's fraudulent
scheme and further, it makes no mention of either the Pike or
Lamar County properties.  Likewise, there was nothing in Deer's
plea hearing to indicate that Phillips' inflating square footage
was part of the scheme to which Deer pled guilty.  The court thus
concludes that the government has not shown that Phillips' actions
relating to these properties were within the scope of the scheme
to which Deer pled guilty.

     Deer contends that he should not owe any restitution to First
Bank relating to the loan ostensibly secured by the Social
Security Building in McComb since TPI's bankruptcy estate entered
into a civil settlement with First Bank pursuant to which First
Bank agreed to release TPI from all civil liability.  Citing
Sheinbaum, 136 F.3d at 447, he argues that since First Bank has
already been compensated in connection with this loan, then he is
not required to pay restitution.  Relating to this settlement,
Henderson testified that in his capacity as TPI's bankruptcy
trustee, he reviewed the liens that First Bank and Wachovia had on
the Social Security Building in McComb and noticed that both
lenders' deeds of trust were flawed in ways unrelated to Phillips'
criminal behavior.  He challenged the deeds of trust in the
bankruptcy proceeding, and as a result of this challenge, First

Bank entered into a settlement with TPI's bankruptcy estate,
pursuant to which First Bank received a four-ninths share of the
sale of the property as well as a four-ninths share of the lease
proceeds, totaling $389,667, in exchange for First Bank's complete
release of all claims against TPI relating to the subject loan.
The bankruptcy court approved the settlement on October 5, 2007.

By virtue of the bankruptcy settlement, First Bank received a
significant amount toward its loss on the Social Security
Building, a loss which was not entirely attributable to Phillips
and Deer, but which was owed in part to the negligence of First
Bank's agent; and it released TPI from all further liability.
While the court gave effect to First Bank's complete release as it
concerned Phillips, the court is not persuaded that allowing Deer
to "share" in the release would serve the penal purpose of the
statute.  Accordingly, Deer will be ordered to pay First Bank
restitution.  See Sheinbaum, 136 F.3d at 447 (effect of a civil
settlement on a criminal restitution "depends upon the payment
made in the settlement, whether the claims settled involved the
same acts of the defendant as those underlying his criminal
conviction, and whether the payment satisfies the penal purposes
the court sought to impose").  This being said, because Williams
presented the amount owed to First Bank as a bottom line figure
and did not distill the loss loan by loan, the court is unable to
compute the amount of restitution owed on account of the Social

Security Building.  Accordingly, the court directs that the
government shall have thirty days to present proof upon which the
court may determine the loss amount related to First Bank's loan
on the Social Security Building.

### Fidelty National Title Insurance

Fidelity National Title Insurance (Fidelity) insured the
deeds of trust for First Bank on the Social Security Building and
for Wells Fargo Home Mortgage on a home in Gloster, Mississippi,
and another in Summit, Mississippi.  According to the government,
Fidelity suffered an actual loss of $50,000 in principal and
$14,390.04 in attorneys' fees in connection with First Bank's deed
of trust on the Social Security Building in McComb, while it
sustained a loss of principal of $63,770, arising from the Gloster
home and of $64,890 on the Summit home.  Thus, the government
maintains that Fidelity is entitled to restitution in the amount
of $193,050.04.

In response, Deer does not dispute that Fidelity is entitled
to restitution related to claims on the deeds of trust for the two
homes.  However, he maintains that the government has failed to
demonstrate that his criminality is the cause of Fidelity's losses
related to the Social Security Building, and asserts instead that
Fidelity paid First Bank's claim because of an unrelated error on
the deed of trust which was filed in the chancery court.  Under
the MVRA, a "victim," "in the case of an offense that involves as

an element a scheme, conspiracy, or pattern of criminal activity,"
is defined as "any person directly harmed by the defendant's
criminal conduct in the course of the scheme, conspiracy, or
pattern."  In the court's opinion, the cause of Fidelity's loss in
connection with the Social Security Building in McComb was
unrelated to Phillip's and Deer's criminal conduct, and
accordingly, Deer is not responsible for restitution on account of
Fidelity's loss in this regard.

Parish National Bank

The government maintains that Parish National Bank (PNB) is
entitled to restitution in the amount of $347,402.24 on account of
Phillips' bank fraud, which includes $297,998.35 in unpaid
principal and $49,403.89 in interest.  Deer disputes that the
asserted loss was caused by fraud and maintains, instead, that in
connection with the sale of Phillips' residence, which secured a
construction loan by PNB, the bank failed to request that two
other loans that it held be paid out of the sale proceeds.  He
also points out that the government does not dispute that he was
not involved in any way with this transaction.

The PSIR sets forth the following regarding this lender:

On July 17, 2006, bank officials with Parish National
Bank (PNB) met with detectives with the St. Tammany
Parish Sheriff's Office, in reference to a complaint of
bank fraud, and determined the following.  On April 22,
2005, James Todd and Shelly Phillips obtained a loan
from PNB in the amount of $800,000.00 for the
construction of a home located at 141 Riverwalk in
Madisonville, Louisiana.  On July 14, 2005, the Phillips

20

obtained another loan from PNB in the amount of
$303,000.00 to complete construction of the home. The
second loan was secured through cross-collateralization
on the first loan. On October 28, 2005, the Phillips
obtained a third loan from PNB in the amount of
$356,000.00. This loan was secured by collateral of
both Lot 4, Lakeview Court, in Covington, Louisiana, and
the first loan. On March 7, 2006, the Phillips entered
into a contract to sell the residence at 141 Riverwalk
in Madisonville. Mahony Title contacted PNB to obtain
the payoff of the original loan, and received the payoff
for the original loan, which was $799,014.22. The
second and third loans from PNB were not included in the
settlement of the property, but should have been paid to
PNB at closing. Instead, $303,000.00, the amount of the
second loan, and $356,000.00, the amount of the third
loan, was paid to James and Shelly Phillips.

After the closing on this property was complete, the
Phillips received $1,095,219.06. The PNB bank officials
advised the detectives that once they learned that the
additional loans were not paid at closing, they
attempted to collect the extra money obtained by the
Phillips. PNB received three checks from TPI to "pay
down" the outstanding loans. The first check, made
payable to PNB, was in the amount of $4,500.00. PNB
attempted to pass this check through on two occasions
and each time it came back indicating insufficient
funds. The second and third checks, both dated May 23,
2006, also made payable to PNB, were each in the amount
of $4,500.00, as well. Todd Phillips spoke with PNB
official Stacie Kraft and requested that she hold the
second and third checks as he had stopped payment on
them. PNB officials told the detectives that all
attempts to collect the money owed by the Phillips had
been futile. Todd Phillips was charged with Collateral
Security Violation [in state court]. The trial in that
case has been continued until after Phillips is
sentenced in the instant offense.

In the court's opinion, the loss to this lender was not

occasioned pursuant to the scheme to which Deer pled guilty.

While it did occur during the time-frame in which the fraudulent

scheme was in play, the government has not shown that Phillips'

21

failure to pay PNB the money owing on the two other PNB loans was part of the scheme.  Rather, it appears more likely the failure to pay was occasioned by PNB's failure to apprise the buyer's closing agent of the additional amounts which were due.  The government has not demonstrated that Phillips' transactions with this lender involved double-encumbered property and/or either fraudulent title opinions or cancellations of deeds of trust.[7]  Accordingly, PNB is not entitled to an order of restitution.

    Central Progressive Bank

    According to the government, Central Progressive Bank is entitled to $740,411.48 in restitution, which includes $500,000 in principal, $102,747.90 in interest, $137,262.19 in attorneys' fees and $401.39 in other fees, relating to Loan Number 1402773 which, based on Phillips' fraud, Central Progressive erroneously believed was secured by a first deed of trust in certain Mall Property located in McComb, Mississippi.  Deer urges that restitution amount should be reduced by the value of the security interest which Central Progressive holds in the property.  He also maintains that in light of his settlement with Central

---

    [7]    At the sentencing hearing, the government argued that Phillips' actions with regard to PNB Bank could be considered by the court as relevant conduct.  While it may be appropriate to have considered this conduct in calculating his guideline range, "[t]he standard for 'relevant conduct' under the Guidelines is more lax than that for determining what conduct can be the basis of restitution."  United States v. Wright, 496 F.3d 371, 381 (5th Cir. 2007).

Progressive, as evidenced by a consent order entered by the
bankruptcy court on December 12, 2009, no restitution should be
ordered.

Given Agent Williams' equivocation with respect to the
outstanding balance on the Central Progressive loan and his
inability to confirm a loss amount of $500,000, the court must
conclude the government has failed to establish a principal loss
greater than the $250,000 identified in the PSIR.  However, Deer
has cited no authority, and the court is unaware of any, which
holds that Central Progressive's retention of a security interest
in the collateral, as opposed to having acquired title to the
property through foreclosure or by other means, supports a
reduction in the loss amount by the value of the security
interest.  Lastly, the court is not persuaded that Deer should be
afforded an offset on account of Deer's settlement with Central
Progressive.  Unlike Phillips' settlement with First Bank, Deer's
settlement does not purport to act as a complete release from
liability, nor has Central Progressive received any cash in hand
as a result of its agreement with Deer.  Under these
circumstances, the court concludes that granting Deer an offset
would not satisfy the penal purpose of a restitution award.
Accordingly, the court finds that the government has shown that
Central Progressive is entitled to restitution from Deer in the
amount of $301,775.34.

Closing and Title Services LLC and Zurich Insurance Company

An attorney who does business as Closing and Title Services closed a loan for Phillips from Wachovia which was collateralized by the Social Security Building in McComb.  In connection with the transaction, the attorney relied on a fraudulent cancellation of the prior deed of trust that had been filed or caused to be filed by Phillips.  Although the prior security was in favor of First Bank, the cancellation, in addition to being fraudulent, incorrectly recited that the deed of trust that had been satisfied was from "First National Bank of Hattiesburg," rather than from First Bank.  As a result of the attorney's reliance on the fraudulent cancellation, Wachovia lost its priority position and made a claim against the attorney's errors and omissions policy.  Closing and Title Service paid a $5,000 deductible, for which the government seeks restitution, and the errors and omissions carrier, Zurich Insurance Company (Zurich), paid Wachovia $495,000 on account of its insured's reliance on the fraudulent cancellation from Phillips, which amount the government contends Zurich is entitled to recover as restitution.[8]

_____

[8]     In addition to this transaction, evidence was presented of a second loan closed by the same attorney for Phillips on a lot at Bradford Place.  In connection with the Bradford Place loan, the attorney missed a prior deed of trust on the property, which resulted in a claim and payment by Zurich.  Any loss in connection with that transaction is unrelated to Phillips and Deer, and would not be recoverable as restitution.

Although Deer contends otherwise, the court is persuaded that
Closing and Title Services was directly harmed by Phillips'
actions taken pursuant to his and Deer's fraudulent scheme.
Phillips produced the subject fraudulent cancellation, on which
the closing attorney relied, pursuant to the scheme to double
encumber property; and in the court's view, assuming the closing
attorney may have been negligent in accepting the cancellation at
face value, his negligence does not sever the causal connection
between Phillips' and Deer's fraud and the attorney's loss.
Accordingly, restitution in the amount of $5,000 will be ordered
for Closing and Title Services.  The court likewise concludes that
Phillips' and Deer's fraudulent scheme was also the cause, or
substantial cause, of Zurich's claimed loss, and therefore,
restitution for Zurich will be ordered in the amount of $495,000.

State Bank & Trust

The government contends that State Bank & Trust is entitled
to restitution in the amount of $322,192.17, which includes a
principal balance of $387,192.17, less $65,000 which was paid by
the TPI bankruptcy estate on account of "lent money on Amite
County property that was double pledged to Wachovia and condos in
Pike County that [were] double pledged to Your Bank."  In
response, Deer maintains that the government has failed to sustain
its burden to establish the loss, if any, as to this victim,
because Agent Williams was unable to explain the basis of State

25

Bank & Trust's computation of its claimed loss amount, and because the government failed to account for the return of some of the collateral for the State Bank & Trust loan.

At the hearing, Henderson testified that "State Bank & Trust had received their collateral back," yet Agent Williams could not explain to the court whether State Bank & Trust's calculation of its claimed loss accounted for the return of the collateral.

Although it is clear the government has failed to prove the amount of State Bank & Trust's loss, the court will give the government the opportunity to address its omission by allowing it to submit to the court, within thirty days, an affidavit detailing the various transactions for which State Bank & Trust seeks restitution, which affidavit shall outline the principal amount, any payments made and the value of any returned collateral as of the date of its return.  Only with this information can the court properly determine what, if any, restitution is owed to State Bank & Trust.

First American Title

As a result of Phillips' and Deer's fraudulent scheme, American Bank and Trust made a loan to Phillips, believing it enjoyed a first priority lien position on the Mall Property in McComb, when in fact, there were three prior liens on the property.  First American Title paid American Bank's loss under its title insurance on the loan, and the government contends First

American Title is entitled to restitution of $919,949.08 for this loss.

Deer does not dispute that First American Title has suffered a loss, but he appears to argue either that the loss amount should be reduced by the value of the security interest or offset by a future sale of the Mall Property, which is currently held by another of Phillips' lenders, Pike National Bank.  As previously observed, the court is aware of no authority requiring that the loss be reduced by the value of a security interest.  Further, as a future sale of property held by another lender is entirely speculative, Deer has failed to demonstrate that he is entitled to an offset.  First American is entitled to restitution award of $919,949.08.

Peoples Bank of Franklin County

Peoples Bank of Franklin County (Peoples Bank) loaned Phillips money, erroneously believing, based on Phillips' and Deer's fraud, that it had a first priority lien position on the Mall Property in McComb.  The government seeks restitution for Peoples Bank in the amount of $421,345.69, which includes $363,883.49 in principal, $43,489.93 in interest, and attorney fees of $18,000, less a payment of $4,027.73 by the bankruptcy estate.  Deer asserts that no restitution is in order for Peoples Bank, in light of the circumstances surrounding the bank's

dismissal with prejudice in 2006 of a lawsuit it had brought against Phillips relating to the lien on the Mall Property.

In its restitution order concerning defendant Phillips, the court disallowed an offset on account of this settlement.  In any event, the court is not persuaded that giving Deer credit for Phillips' settlement would satisfy the penal purpose of the restitution order.

Your Bank/Fidelity Homestead Savings Bank

According to the government, Your Bank is entitled to restitution of $1,121,971.70, representing $500,000 in principal, $96,278.17 in interest and $25,692.90 in attorneys' fees on Loan Number 1001535, which was secured by the Northgate Condominiums in Pike County, and $500,000 in principal on Loan Number 1002235, which was secured by the Simpson County Service Center.  Deer does not dispute the loss figures on Loan Number 1002235; but he contends he is entitled to a complete offset of any amount relating to Loan Number 1001535 since Your Bank successfully sued and obtained a judgment against Phillips' father, James Phillips, related to this loan.  Deer submits that to order restitution would amount to a windfall for Your Bank.

The court is not persuaded that this amount should be offset. Deer does not dispute that this loan was made pursuant to the fraudulent scheme to which he pled guilty.  In fact, Agent Williams testified that while Your Bank made the loan to James

Phillips, believing him to be the owner because of a fraudulent
title opinion by Deer, TPI actually owned the property and had
previously pledged it to Pike County National Bank.  Granting Deer
credit for Your Bank's judgment against Phillips' father would not
serve the penal purpose of a restitution order.

Saxon Mortgage

In its post-hearing submission, the government acknowledges
payment was made by the bankruptcy estate to Saxon Mortgage, as a
result of which Saxon Mortgage is not due any restitution.

Conclusion

Based on the foregoing, Deer is ordered to make restitution
as follows:

```
Fidelity National Title Insurance          $  128,660
Parish National Bank                        $  0
Central Progressive Bank                    $  301,775.34
Closing and Title Services, LLC             $    5,000
Zurich Insurance Company                    $  495,000
First American Title                        $  919,949.08
Peoples Bank of Franklin County             $  403,345.69
Your Bank/Fidelity Homestead Savings Bank   $1,121,971.70
Saxon Mortgage                              $  0
```

With respect to Concordia Bank & Trust, First Bank and State
Bank & Trust, the parties shall have thirty days from this date to
submit the information referenced supra at pages 14-19 and 25-26,
so that the court may determine what, if any, restitution is owed
these alleged victims.  Each party may respond to the other's
submission within ten days thereafter.  A final restitution order
will be entered once a determination is made as to the total
amount of restitution owing from Deer.

29

SO ORDERED this 24th day of June, 2011.


  /s/Tom S. Lee
UNITED STATES DISTRICT JUDGE